UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 06-339-GWU

| | |
|---|---|
| JIMMY ANGLAIN, | PLAINTIFF, |
| VS.  **MEMORANDUM OPINION** | |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY, | DEFENDANT. |

## INTRODUCTION

The plaintiff originally brought <u>Anglian v. Barnhart</u>, London Civil Action No. 02-526 (E.D. Ky.) to seek judicial review of an administrative decision to deny his application for Supplemental Security Income (SSI) benefits made in July, 2000. (Tr. 17-26, 103-6).[1] After a period of reconsideration prompted by the undersigned's memorandum opinion, order, and judgment of February 6, 2004 (956-66), another negative agency decision was issued (Tr. 925-35). The appeal is again before the court on cross-motions for summary judgment.

## APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. <u>Jones v.

---

[1] Although evidence in the transcript shows that the plaintiff's name is spelled "Anglian," as given in the previous court decision, the current action was filed under the spelling "Anglain."

1

Anglain

Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Crouch, 909 F.2d at 855.

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process. Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986). An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless." Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national

economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 CFR Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 CFR 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott

3

Anglain

v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 CFR Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid.  In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

**DISCUSSION**

In brief, the case was previously remanded for further development of the issue of whether Mr. Anglian met the Commissioner's Listing of Impairment (LOI) 12.05C, captioned "Mental Retardation."  20 C.F.R. Pt. 404, Subpt. P, App. 1 (2005).  This listing provides for a finding of disability if the claimant can show "a valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. There were two IQ tests which had been administered as an adult, both conducted by psychologist Gary Maryman, and both of which produced verbal IQ scores of 69.  In 1997, the plaintiff's performance IQ was tested as 67, and in

4

1998, it was tested as 69. His full-scale IQ scores were 67 and 65, respectively. (Tr. 482, 635). However, Dr. Maryman had concluded after the 1997 testing that the scores were something of an underestimate of the plaintiff's true abilities, possibly as a result of long-term alcoholism (Tr. 481), but, in contrast, had indicated that the 1998 scores appeared to be reliable and valid (Tr. 635). Therefore, it appeared that the plaintiff did have a valid IQ score of 60 through 70 as an adult. The ALJ had rejected the applicability of LOI 12.05C, however, because Maryman had made a clinical estimate of borderline intellectual functioning and because the plaintiff had some reading ability, had completed the eighth grade in regular classes, and was able to work as a carpenter's helper. (Tr. 19). In view of the fact that school records from May 1973, when the plaintiff was 11 years old, had shown a performance IQ of 66, which was virtually the same as his performance IQ in adult testing, along with a verbal IQ of 95, and a full-scale IQ 77 (Tr. 123), the court remanded the case for further consideration of whether the plaintiff had met the requirement in LOI 12.05 of demonstrating "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."

On remand, the ALJ sought testimony from a medical expert (ME), psychologist Neil Lewis. On the issue of whether the plaintiff met the requirements of 12.05C, Dr. Lewis agreed that there was a valid IQ score below 70 by an examiner, but opined that the record did not document deficits in adaptive

Anglain

functioning during the developmental period. (Tr. 1194-1196). He opined that the 1973 school testing was not necessarily valid because it had not been performed by a licensed psychologist, but rather by an individual who was listed as a "counselor." (Tr. 1220, 1224-5). He felt that it was significant there was a 29 point difference between the verbal and IQ scores in the 1973 testing, which was a discrepancy in scores he had never seen in over 40 years of administering IQ testing, and noted that the same page of school records contained a reference to a California Mental Maturity test score of 52, which would be consistent with "moderate" mental retardation rather than the "mild" mental retardation suggested by an IQ in the high 60s. (Tr. 1220). He also opined that the plaintiff would not have been able to perform as well as he did on the matrix subtest of performance IQ testing if he were truly retarded. (Tr. 635, 1225-6). Therefore, he concluded that there was good reason to question the validity of the 1973 school testing. In addition, from other evidence in the record, Dr. Lewis opined that the plaintiff had not shown deficits in adaptive functioning initially manifested during the developmental period. (Tr. 1196). The plaintiff was able to drive a car, although he had never obtained a license (Tr. 881), had been able to perform some work as a carpenter's helper and landscaper (Tr. 882-4), and had mentioned on more than one occasion he had liked to read Western novels and Stephen King novels, although at the time of the most recent hearing denied doing so currently (Tr. 635,

Anglain

892, 1245).[2]  Dr. Lewis felt that his reading level, which had been tested by Dr. Maryman at the sixth grade level in 1998 (Tr. 635) was not compatible with mild mental retardation  (Tr. 1221).  Finally he noted that neither Dr. Maryman or Dr. William Rigby, who had also conducted a psychological examination albeit without specific IQ testing, had estimated that the plaintiff functioned in the range of mild mental retardation.  (Tr. 1205).[3]

While there is some evidence which could be interpreted differently, the testimony of the ME does provide substantial evidence from which a reasonable finder of fact could have concluded that the Listing was not met.

On appeal, the plaintiff requests a remand for a specific opinion from Dr. Maryman, but while the court identified Maryman's unfamiliarity with the school testing as a reason for questioning the reliability of the administrative conclusion that the plaintiff had not shown deficits during the developmental period, the

---

[2] As the court noted in its previous Opinion, the Sixth Circuit has held that some of these activities are not facially inconsistent with an IQ of 68. <u>Brown v. Secretary of Health and Human Services</u>, 948 F.2d 268, 270 (6th Cir. 1991). In the present case, the ME offered testimony that the plaintiff's functioning was inconsistent with mental retardation.

[3] The plaintiff reportedly told Dr. Rigby that he was capable of cooking, doing household chores, talking on the telephone, dialing long distance, looking up numbers in the phone book, using the U.S. mail, making change, and buying things at the store. He added that "[t]he claimant's social interactions with this examiner were those of a competent adult" and "[h]e appears intellectually adequate for daily adult life." (Tr. 666-7).

7

Anglain

testimony of a qualified ME with access to the entire record is adequate to address this particular concern and resolve the conflicts in the evidence.

The plaintiff also disputes the ME's conclusion that 12.05C could not be met without considering the language in the introductory paragraph referring to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." However, the Sixth Circuit has ruled that the requirements of the introductory paragraph must be met in order to meet the Listing. Foster v. Halter, 279 F.3d 348, 354-5 (6th Cir. 2001).

The plaintiff questions the ME's testimony regarding the level of adaptive functioning required to meet the listing, arguing that the expert was confusing more severe levels of mental retardation with the types of functioning compatible with "mild" mental retardation.[4] The plaintiff notes that the Diagnostic and Statistical Manual of Mental Disorders (4th Edition-Text Revision) (DSM-IV-TR) specifies that individuals with mild mental retardation can acquire academic skills up to approximately the sixth grade level and can usually achieve social and vocational skills adequate for minimum self-support. DSM-IV-TR, p. 43. The plaintiff argues that his level of functioning is entirely consistent with this definition. Evidently, however, neither Dr. Rigby, who assessed the plaintiff as being "slightly below

---

[4]Dr. Lewis testified that adaptive functioning, while difficult to measure, referred to the ability to communicate, take care of oneself, and deal with other people. (Tr. 1198).

average" intellectually (Tr. 664) , or Dr. Maryman, who assessed the plaintiff as functioning in the "borderline" range despite his test scores, believed that the plaintiff was functioning in the range of mild mental retardation.  In addition, the school counselor in 1973 who had obtained an IQ of 66 chose to place the plaintiff in regular classes, rather than special education.  (Tr. 123).  In summary, even assuming that the ME's testimony had certain deficiencies, there was sufficient evidence from which to conclude that the plaintiff was not actually functioning in the range of mild mental retardation.

Finally, the plaintiff argues that testimony from a vocational expert (VE) was not sufficient to carry the Commissioner's burden of proof because the hypothetical question did not specify that the individual's intellectual functioning fell in the lowest 10 percent of the national population.[5]  The VE had identified jobs such as production assembler, hand packer, production laborer, small products assembler, small products inspector.  (Tr. 1208).  The plaintiff argues that the Dictionary of Occupational Titles (DOT) lists certain requirements for the jobs of "hand packager" and "bench assembler" which would be inconsistent with a person whose IQ is in the lowest 10 percent of the population.  In support, the plaintiff cites the

---

[5]The ALJ had asked the VE whether an individual of the plaintiff's age and work experience could perform any jobs if he were capable of "light" level exertion, and had non-exertional impairments of (1) no better than sixth grade reading ability or work involving other than simple, routine tasks in low social demand situations; (2) no climbing, work around hazards, heights, or around moving or dangerous machinery; and (3) occasional balancing.  (Tr. 1207-8).

Anglain

undersigned's opinion in <u>Cody v. Commissioner of Social Security</u>, London Civil Action No. 05-612 (E.D. Ky. December 15, 2006); he concedes that in that particular case there was testimony from a VE stating that the jobs he had described were inconsistent with functioning in the bottom 10 percent of the national population and that it was a crucial factor. In the present case, there is no such vocational testimony. In fact, the VE asserted that her testimony was consistent with the DOT. (Tr. 1208-9).

The decision will be affirmed.

This the 2nd day of May, 2007.

Signed By:

<u>G. Wix Unthank</u>

**United States Senior Judge**